## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RAYMOND LAUGAND**                              **CIVIL ACTION**

**versus**                                        **NO. 06-5269**

**N. BURL CAIN**                                  **SECTION: "K" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Raymond Laugand, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On December 1, 2000, he was found guilty of second-degree murder of Kevin Mathieu in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On January 23, 2002, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[3]  On April 9, 2003, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4]  Petitioner's related application for a writ of certiorari[5] was denied by the Louisiana Supreme Court on January 9, 2004.[6]

On June 25, 2004, petitioner filed with the state district court an application for post-conviction relief.[7]  That application was denied on November 10, 2004.[8]  He next filed with the Louisiana Fourth Circuit Court of Appeal an application for a supervisory writ of review[9] which was

---

[2]  State Rec., Vol. VI of IX, transcript of December 1, 2000, p. 22; State Rec., Vol. I of IX, minute entry dated December 1, 2000; State Rec., Vol. III of IX, jury verdict form.  Petitioner was originally convicted of the offense on February 28, 1997; however, that conviction was subsequently reversed by the Louisiana Supreme Court based on a finding that petitioner received ineffective assistance of counsel.  State v. Laugand, 759 So.2d 34 (La. 2000).  The instant *habeas corpus* application relates to petitioner's conviction on retrial.

[3]  State Rec., Vol. VI of IX, transcript of January 23, 2002, p. 7; State Rec., Vol. I of IX, minute entry dated January 23, 2002.

[4]  State v. Laugand, No. 2002-KA-0873 (La. App. 4th Cir. Apr. 9, 2003) (unpublished); State Rec., Vol. I of IX.

[5]  State Rec., Vol. VI of IX.

[6]  State v. Laugand, 862 So.2d 980 (La. 2004) (No. 2003-K-1868); State Rec., Vol. I of IX.

[7]  State Rec., Vol. VIII of IX.

[8]  State Rec., Vol. VIII of IX, Docket Master, entry for November 10, 2004.

[9]  State Rec., Vol. VIII of IX.

denied on January 19, 2005.[10]  He then filed with the Louisiana Supreme Court an application for a writ of certiorari[11] which was denied on April 28, 2006.[12]  He filed an application for rehearing[13] which was likewise denied on August 18, 2006.[14]

On August 24, 2006, petitioner filed this federal application for *habeas corpus* relief.[15]  In support of his application, he raises the following claims:

1. Petitioner received ineffective assistance of counsel;

2. The trial court erred in refusing to allow the defense to impeach Brian Mathieu;

3. The trial court erred in refusing to allow the defense to reveal to the jury that Drapper Goff's testimony was untainted by the pendency of criminal proceedings against him;

4. The prosecution presented perjured testimony; and

---

[10]   State v. Laugand, No. 2004-K-2107 (La. App. 4th Cir. Jan. 19, 2005) (unpublished); State Rec., Vol. VIII of IX.

[11]   State Rec., Vol. VIII of IX.

[12]   State *ex rel.* State v. Laugand, 927 So.2d 278 (La. 2006) (No. 2005-KH-0637); State Rec., Vol. VIII of IX.

[13]   State Rec., Vol. VIII of IX.

[14]   State *ex rel.* State v. Laugand, 935 So.2d 133 (La. 2006) (No. 2005-KH-0637); State Rec., Vol. VIII of IX.

[15]   Rec. Doc. 4.

5. The trial judge abused his discretion in failing to declare a mistrial.[16]

The state concedes that petitioner's application is timely filed[17] and does not contend that he failed to exhaust his state court remedies.

Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses
> have independent meaning.  A federal habeas court may issue the
> writ under the "contrary to" clause if the state court applies a rule
> different from the governing law set forth in our cases, or if it decides
> a case differently than we have done on a set of materially

---

[16]  The fifth claim is asserted in petitioner's amended petition, Rec. Doc. 16.

[17]  Rec. Doc. 10, p. 4.

indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1); Hill, 210 F.3d at 485.

Facts

The facts of the instant case, summarized by the Louisiana Fourth Circuit Court of Appeal on direct appeal, are as follows:

On March 16, 1996, at approximately 3:00 p.m., Detective Glenn Taylor responded to a call of homicide in the St. Bernard Housing Development. At the scene, Taylor noticed the remnants of a child's birthday party, complete with a Space Walk in the courtyard. He also learned that the victim had been transported to Charity Hospital, where he died shortly thereafter. Crime scene technicians recovered a bicycle, seven spent bullet casings and one bullet in the spot where the victim's body was found. The first police officers on the scene developed siblings James Jordan, Brian Mathieu and Darylynn Ramsey as eyewitnesses to the shooting.

On March 16, 1996, James Jordan watched from his apartment as family and friends enjoyed his six-year old nephew's birthday party in the courtyard of the St. Bernard Housing Development. The victim was seated on his bike talking to his cousin Brian Mathieu. Jordan observed the defendant and Drapper Goff drive up in a green car, and park in the rear of Jordan's apartment building. As the defendant exited the front passenger seat, he placed

a hockey mask on top of his head, and carried a gun.  Jordan observed the defendant enter the courtyard from one side of the building, while Goff stood watch on the opposite side of the building. The defendant pulled the mask over his face, approached the victim from behind, and shot him several times.  After the shooting, the defendant removed the mask from his face.  He and Goff ran to the rear of the building, and fled in their vehicle.  Jordan identified Goff and the defendant in photographic lineups and at trial.

Darylynn Ramsey had just gotten home from work in time to attend her nephew's birthday party on March 16, 1996.  After parking her car, she walked toward the courtyard, where she saw the defendant peeping around a building into the courtyard.  She was about fifteen feet from the defendant as he held a hockey mask in one hand and a gun in the other.  When the defendant pulled the mask over his face, and ran behind the Space Walk, the witness fled the courtyard.  She heard several shots, and kept running until the shooting stopped, at which time she returned to the courtyard.  She saw the victim on the ground bleeding from gunshot wounds.  Ms. Ramsey identified the defendant from a photographic lineup and at trial as the shooter.

Brian Mathieu also attended the birthday party in the courtyard.  As his daughter jumped in the Space Walk, Mathieu spoke to the victim, his cousin, about the victim bringing his son to the party.  As the victim prepared to leave the party on his bicycle, a gunman came up behind the victim, and shot him.  Brian Mathieu was standing next to the victim when the shooting started, and at first thought he was the gunman's target, not his cousin.  After shooting the victim several times, the gunman removed his mask, and Mathieu recognized him as Raymond Laugand, someone he had known for years.  Mathieu identified the defendant in a photographic lineup and at trial.

Officer Byron Winbush, a firearms examiner with the NOPD Crime Lab, examined the bullet and casings found at the scene as well as the bullet retrieved from the victim's body during the autopsy. The bullets and casings were all .45 caliber.  All seven casing were fired from the same weapon.

Dr. Richard Tracey, a pathologist with the Orleans Parish Coroner's Office, performed the autopsy on the victim's body.  The victim suffered three gunshot wounds to his back.  Two of the bullets exited the body.  One bullet was retrieved from the victim's body during the autopsy.  All three bullets inflicted massive injuries to vital

- 6 -

organs, causing the victim to bleed to death.  Any one of the wounds would have been sufficient to kill the victim.

Eugene Forrest and Gordon Newman testified for the defense. Both men stated that they were incarcerated with State's witness Brian Mathieu at various times after the March 16, 1996, shooting. Forrest and Newman testified that Brian Mathieu told them that he did not actually see who the shooter was, contrary to what he told the police shortly after the incident.

Drapper Goff also testified as a defense witness.  Goff stated that he witnessed the shooting in the St. Bernard Housing Development on March 16, 1996.  Goff identified Dwayne "Peppy" Harrington [FN] as the shooter.  He denied knowing the defendant. Goff admitted under cross-examination that although he was tried for this offense in 1997, he did not identify Harrington as the shooter until 1999, and then, only to the private investigator hired by the defense.

> [FN] Dwayne Harrington is the defendant's deceased brother.  Harrington was murdered on July 6, 1996.

The defendant testified that he did not know the victim but that he knew the victim's siblings, and that they knew him.  He also said he knew Drapper Goff.  The defendant stated that the witnesses were lying but did not know why they would accuse him of the crime.  He denied being at the scene of the shooting, and denied shooting the victim.[18]

### Ineffective Assistance of Counsel

Petitioner claims that he received ineffective assistance of counsel.  In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>See</u> <u>id</u>. at 697.

---

[18] <u>State v. Laugand</u>, No. 2002-KA-0873, at pp. 2-4 (La. App. 4th Cir. Apr. 9, 2003) (unpublished); State Rec., Vol. I of IX.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim.  Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson,

227 F.3d 273, 284 (5ᵗʰ Cir. 2000).  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5ᵗʰ Cir. 2002). Therefore, this Court must defer to the state court on such a claim unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

In the instant case, petitioner claims that his counsel was ineffective in failing to secure the presence of Detectives Taylor, Adams, and St. Martin to impeach witnesses Brian Mathieu, Darylynn Ramsey, and James Jordan based on their prior statements.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  State v. Brooks, 94-2438, p. 6 (La. 10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606 (La. App. 4 Cir. 8/1/99), 744 So.2d 119, 126.  In order to prevail, the defendant must show both that:  (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency.  Brooks, supra; State v. Jackson, 97-2220 (La. App. 4 Cir. 5/12/99), 733 So.2d 736, 741.  Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, (La. App. 4 Cir. 2/10/99), 729 So.2d 664, 669.  Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial.  To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability

is a probability sufficient to undermine confidence in the outcome."
Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387
(La. App. 4 Cir. 5/19/99), 737 So.2d 231, 236.

The defendant has shown no prejudice.  The statements with
which the defendant sought to impeach the State's witnesses are
statements the witnesses allegedly made to Detectives St. Martin and
Adams, as chronicled by Officer Taylor in his report.  The statements
are at best double hearsay and at worst come with no guarantee of
trustworthiness.  Moreover, defense counsel cross-examined all of the
State's witnesses thoroughly, and at length.  He skillfully tested their
memories of events and facts, probing any inconsistences and
discrepancies for the jury's benefit.  The failure of St. Martin and
Adams to be present for trial is not grounds to find defense counsel's
performance deficient and thus fails to support a claim of ineffective
assistance of counsel.  This assignment is without merit.[19]

With respect to Mathieu, petitioner points to alleged inconsistencies between
Mathieu's trial testimony and a statement he gave to Detective Glenn Taylor.  In the statement,
Mathieu stated:  "As he [petitioner] was running off, I'm, I just ran round the building, as he was
running off, I'm standing on side of the building, now he running towards where ever he come from,
off the side the building ... and they, and they fled from there."[20]  At trial, Mathieu denied running
after petitioner after the shooting.[21]  The statement and the testimony are not necessarily
inconsistent.  Although the statement indicates that Mathieu ran somewhere after the shooting, it
does not clearly indicate that he ran in the same direction as and in pursuit of petitioner.  Petitioner
also notes that, at another point in the statement, Mathieu seems to indicate that he saw the getaway

---

[19]  State v. Laugand, No. 2002-KA-0873, at pp. 10-11; State Rec., Vol. I of IX.  The Louisiana
Supreme Court denied the related writ application without assigning reasons.  State v. Laugand, 862
So.2d 980 (La. 2004) (No. 2003-K-1868); State Rec., Vol. I of IX.

[20]  Rec. Doc. 4, statement dated April 30, 1996, p. 2.

[21]  State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 127-28.

car.[22]  Petitioner argues that Mathieu testified at trial that he had not seen the car.  That, too, is

inaccurate.  Mathieu testified that he did not see who was *driving* the car;[23] he did not state that he

did not see the car at all.

        Petitioner next points to Detective Taylor's police report which states:  "Detective

St. Martin next spoke with Brian Matthews [sic] who stated that the subjects who shot Keith were

believed to have been involved in the shooting of Emile Ranker that occurred a few days ago."[24]

Petitioner argues that statement is inconsistent with Mathieu's trial testimony, in which he testified:

> Q.      Do you remember telling Officer St. Martin or any other
>         officer that the person who committed this homicide was
>         Keno Jackson, Nelson Jackson, and Leroy Day?
>
> A.      No, no.[25]

Even putting aside the fact that the statement in the report is hearsay of hearsay, petitioner's

testimony again is not necessarily inconsistent.  The report does not indicate that Mathieu stated that

the perpetrators were Keno Jackson, Nelson Jackson, and Leroy Day.  He allegedly said only that

he believed that the perpetrators were the same people who shot Ranker; however, the report does

not establish that Mathieu knew or believed that Keno Jackson, Nelson Jackson, and Leroy Day

were the persons who shot Ranker.  Although the police report later indicates that *Ranker* identified

---

[22]  Rec. Doc. 4, statement dated April 30, 1996, p. 3.

[23]  State Rec., Vol. V of IX, transcript of November 29, 2000, p. 106.

[24]  Rec. Doc. 4, police report, p. 12.

[25]  State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 126-27.

the persons who shot him as "Keno Jackson, Nelson Jackson, and Leroi Day,"[26] there is nothing to indicate that Mathieu was aware of that fact.

Similarly, petitioner complains that the trial testimony of Darylynn Ramsey was inconsistent with a taped statement she gave to Detective Taylor on May 2, 1996, and with hearsay statements attributed to her in Taylor's police report.  As to the inconsistencies between Ramsey's testimony and the taped statement, defense counsel in fact cross-examined her at length at trial regarding those discrepancies and, accordingly, the failure to call Taylor with respect to those discrepancies was of little consequence.[27]  With respect to the police report, Taylor included within that report a hearsay statement indicating that Ramsey purportedly told another officer, i.e. Detective Adams, that Drapper Goff had the mask and gun;[28] however, at trial, Ramsey stated that petitioner had the mask and gun[29] and that she had not even seen Goff on the day of the shooting.[30]  Petitioner argues that counsel should therefore have called Detective Adams to impeach Ramsey.

As to James Jordan, petitioner points to an alleged inconsistency between Jordan's testimony and his taped statement regarding when he first saw petitioner's gun.  In the statement, Jordan indicates that he did not see the gun in petitioner's hand when he exited the car.[31]  However,

---

[26]  Rec. Doc. 4, police report, p. 12.

[27]  State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 152-56.

[28]  Rec. Doc. 4, police report, p. 11.

[29]  State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 139-43.

[30]  State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 148-49.

[31]  Rec. Doc. 4, statement dated April 30, 1996, p. 2.

his trial testimony was unclear as to when he first saw the gun; in fact, within a single answer he was inconsistent, saying, "I seen the Jason mask and the gun when Raymond got out the car.  I didn't see no gun or nothing."[32]

This Court notes that a decision regarding whether to attempt to impeach a witness, and, if so, to what extent, is a matter which calls on counsel's professional judgment and requires him to balance a number of factors, including but not limited to the relative importance of the perceived inconsistencies, the likelihood of whether a witness can explain those inconsistencies, and the possible alienation of jurors by endless disputes concerning what they may consider ultimately inconsequential and time-consuming issues.  Accordingly, choices regarding impeachment are generally ones of trial strategy and, as such, are not to be lightly second-guessed in a federal *habeas corpus* proceeding.  Regarding such matters of strategy, the United States Fifth Circuit Court of Appeals has noted:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.  Moreover, a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.

---

[32] State Rec., Vol. V of IX, transcript of November 29, 2000, p. 82.  The Court notes that petitioner's claim is particularly weak regarding defense counsel's failure to attempt to impeach Jordan.  Jordan had clear mental limitations, with the trial judge even noting in a bench conference that "this is obviously not a very sophisticated witness, not very educated witness."  State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 78-79.  In light of that fact and the confused nature of Jordan's testimony, defense counsel clearly was not ineffective in failing to try to impeach Jordan on the largely irrelevant point of when he *first* noticed the gun.  The bottom line is that, prior to the murder, he did in fact see the gun and it was being wielded by petitioner.

St. Aubin v. Quarterman, 470 F.3d 1096, 1102 (5th Cir. 2006) (internal quotation marks, brackets, and citations omitted), cert. denied, 127 S.Ct. 2133 (2007).

Those general rules are clearly applicable to defense counsel's failure to call Detectives Adams and St. Martin.  At the conclusion of the first day of trial, defense counsel apparently requested the issuance of subpoenas for those officers; however, the subpoenas could not be served.[33]  However, despite the continued efforts to have Detective Taylor appear, defense counsel apparently made no further efforts to secure the presence of Detectives Adams and St. Martin.  Further, at the end of the second day of trial, defense counsel stated that the only witness he still wished to call was Detective Taylor.[34]  Accordingly, there is no evidence in the record from which the Court may conclude that the failure to call Detectives Adams and St. Martin was anything other than a conscious choice by defense counsel.

On the other hand, the general rules should not apply to the failure to call Detective Taylor, as it is evident that failure resulted from defense counsel's error rather than from "a conscious and informed decision."  After Taylor testified on behalf of the prosecution, he was excused with the consent of defense counsel.[35]  Later, defense counsel realized that he wanted to again call Taylor to the stand.  Nevertheless, despite assistance from the trial court and the

---

[33] State Rec., Vol. V of IX, transcript of November 29, 2000, p. 168; State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 77.

[34] State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 186.

[35] State Rec., Vol. V of IX, transcript of November 29, 2000, p. 49.

prosecutor, as well as the granting of an overnight recess, Taylor's presence could not be secured.[36] However, again, the mere fact that counsel made such a mistake does not mean that petitioner is entitled to relief.  As noted above, before relief is warranted, petitioner must prove that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, " and that showing is made only where confidence in the outcome of the trial is undermined.  Strickland, 466 U.S. at 694.

The Court finds that petitioner has not made the required showings to prove that relief is warranted.  As noted by the state court, the state's witnesses were extensively cross-examined, including, in some instances, regarding inconsistencies with prior statements.  Moreover, as outlined above, many of the "inconsistencies" to which petitioner points are not inconsistencies at all and, in several instances, involved ultimately inconsequential matters.  In light of those considerations, as well as the weight of evidence in this case, the Court finds that petitioner simply has not demonstrated that the conscious choice not to call Detectives Adams and St. Martin was so ill chosen as to permeate petitioner's entire trial with obvious unfairness or that defense counsel's mistake in releasing Detective Taylor from the subpoena was sufficient to undermine confidence in the outcome of petitioner's trial.

In summary, petitioner has not demonstrated that the state court's decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

---

[36] State Rec., Vol. VI of IX, transcript of November 30, 2000, pp. 73-78, 113, and 186-89.

<u>Impeachment of Brian Mathieu</u>

Petitioner next claims that the trial court erred in refusing to allow defense counsel to impeach Brian Mathieu.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> In this assignment, the defendant argues the trial court improperly prohibited the defense from impeaching State witness Brian Mathieu with a prior inconsistent statement.  The defense offered the testimony of Eugene Forrest to show that Mathieu made an inconsistent statement when he allegedly admitted to Forrest that he did not know the identity of the killer.
>
> Generally, an out-of-court statement is inadmissible hearsay. La.C.E. art. 802.  However, Louisiana has long sanctioned the use of prior inconsistent statements to impeach the general credibility of a witness, subject to the rule that such statements are admissible only for their impeachment value and not as substantive evidence, see <u>State v. Cousin</u>, 96-2973, p. 7 (La. 4/14/98), 710 So.2d 1065, 1069, and subject also to the authority of a trial judge to exclude such evidence when its probative value "on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." La. C.E. art. 607(D)(2); <u>Cousin</u>, 96-2973, p. 8, 710 So.2d at 1071.
>
> Before extrinsic evidence of a prior inconsistent statement is admissible, the proper foundation must be laid.  This foundation requires that the time, place and circumstances in which the statement was made be called to the witness' attention and that the witness be given an opportunity to admit or denying having made the prior statement.  The witness' denial of making the prior statement completes the foundation.  <u>State v. Laymon</u>, 95-1520 (La. App. 4 Cir. 3/15/00), 756 So.2d 1160, *writs denied*, 2000-1519 (La. 5/4/01), 791 So.2d 648, 2000-1412 (La. 5/11/01), 791 So.2d 1288.
>
> In this case, the issue of whether Brian Mathieu made statements that were inconsistent to cellmate Eugene Forrest or any other cellmate was not brought to the attention of the court or the witness during the State's case.  As the trial judge pointed out, "... there was no testimony from [Mathieu] that he has made prior statements to these gentlemen."  The defense never "fairly directed the witness' attention to the statement, act, or matter alleged," and the witness was never "given the opportunity to admit the fact" or fail to

admit the fact, as La. C.E. art. 613 requires the defense to do before impeachment becomes available to the defense. As the trial judge further noted to defense counsel, "... you can't just empty the jailhouse out and have inmates come back, every inmate to say they had conversations with Brian Mathieu without addressing these examinations on direct. No, sir, there's nothing to impeach." The court properly prohibited the defense from entering hearsay testimony, and the avenue by which the defense alleged that it should have been able to enter the testimony, i.e., for impeachment purposes, was not legally available.

Nevertheless, even if the trial court's exclusion of the defense witness' testimony constituted error, it was harmless. The defense succeeded in entering the allegation of inconsistent statements by Mathieu. The court allowed Forrest to testify that Mathieu told him he did not actually see the shooting. Moreover, the defense also managed to bring in another of Mathieu's cellmates, Gordon Newman, who also said Mathieu claimed not to have seen the shooting. Hence, even if there was error, which there was not, it was harmless because the defendant suffered no prejudice. This assignment is without merit.[37]

In this proceeding, petitioner argues that the state courts misrepresented or misconstrued his claim. Petitioner explains that his claim does not concern Mathieu's alleged admission that he never saw the shooter but rather involves a prior typed statement Mathieu gave to the police. At trial, Mathieu testified that he signed that statement without reading it and that, in fact, he was unable to read. At one point, he testified: "I don't know what I'm signing. *I still don't know.* I would like for you to read it to me."[38] Petitioner claims that Forrest should have been allowed to testify to impeach Mathieu on that point. Supposedly, Forrest would have testified that

---

[37] State v. Laugand, No. 2002-KA-0873, at pp. 5-6 (footnote omitted); State Rec., Vol. I of IX. The Louisiana Supreme Court denied the related writ application without assigning reasons. State v. Laugand, 862 So.2d 980 (La. 2004) (No. 2003-K-1868); State Rec., Vol. I of IX.

[38] State Rec., Vol. V of IX, transcript of November 29, 2000, pp. 123-24 (emphasis added).

Mathieu revealed the contents of the declaration to Forrest and, therefore, was necessarily lying at trial when he testified that he did not know the contents.

However, even if that is petitioner's claim, it suffers from the same defect noted by the state court.  As the state court explained in the above-quoted passage, Louisiana law does not allow a witness to be impeached unless he is first given the opportunity to admit the disputed fact. That did not occur in this case.  After Mathieu testified that he did not know the contents of the affidavit, he could have been asked whether he remembered a conversation in which he revealed the contents of the affidavit to Forrest.  *If* Mathieu had denied having such a conversation, *then* defense counsel could have used Forrest to impeach Mathieu.  However, because that did not occur, state law would not allow the defense to call Forrest for impeachment purposes.

Further, in any event, federal *habeas corpus* relief would not be warranted even if the trial court had erred in disallowing impeachment on this issue.  The United States Fifth Circuit Court of Appeals has held:

> In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law.  However, a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness.

Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state courts misapplied state law, his claim simply is not cognizable.  Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

Further, to the extent that petitioner is claiming that the exclusion of the evidence rendered his trial fundamentally unfair under federal law, that claim has no merit.  An erroneous evidentiary ruling constitutes a "denial of fundamental fairness" warranting *habeas* relief only where a petitioner demonstrates that the error "played a crucial, critical, and highly significant role in the trial."  Little, 162 F.3d at 862 (5th Cir. 1998).  Petitioner has made no such showing in this case.  The contention that he was not allowed to "impeach" Mathieu regarding his alleged ignorance of the contents of his signed statement is a claim that petitioner was not allowed to present evidence regarding Mathieu's purported lack of credibility.  However, petitioner was allowed to present evidence, through the testimony of several witnesses, including Forrest, Newman, and investigator Bob Smith, that Mathieu had told others that he did not actually see the shooting.  Therefore, better evidence of Mathieu's incredibility was already before the jury, and this additional evidence would have essentially been cumulative.  While petitioner's case might arguably have been minimally bolstered by the evidence, that is not the relevant standard.  Rather, again, petitioner must show that his inability to present the evidence to further undermine Mathieu's credibility played a crucial, critical, and highly significant role in his conviction, and he has fallen far short of making that required showing.

Drapper Goff

Petitioner claims that the trial court erred in refusing to allow the defense to reveal to the jury that Drapper Goff's testimony was untainted by the pendency of criminal proceedings against him.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

- 19 -

[T]he defendant argues the trial court erred in refusing to allow him to reveal to the jury the fact of Drapper Goff's acquittal in the first trial.

Prior to trial, the State filed a motion in limine to prohibit the defense from informing the jury that Drapper Goff had been acquitted of the charge in the first trial. The trial court granted the motion.

On appeal, the defendant maintains that Goff's credibility was undermined because without knowledge of the acquittal, the jury was unable to evaluate Goff's testimony in a proper context. Further, the defendant argues that the defense should have been allowed to use this "background information" to bolster Goff's credibility.

The trial court did not err by excluding testimony concerning Goff's acquittal for several reasons. First, the information constitutes inadmissible hearsay, La. C.E. art. 801 and 802. Second, the information is not probative for determining the guilt of the defendant, and was thus irrelevant. La. C.E. arts. 401 and 402. Third, the defendant's characterization of Goff's acquittal as "background information" that should have been admitted to bolster his credibility is misleading and inaccurate. Informing the jury of Goff's acquittal is not "background information." It would serve only to prejudice the jury into believing that the defendant should likewise be acquitted.

The defense's assertion that Goff was testifying under circumstances that "unfairly handicapped" him, so that the defense should have been allowed to use the "background information" to bolster his credibility, is misguided. The alleged "handicap" is based only on defense speculation about what the jury would or would not have assumed about Goff's testimony, and neither statutory nor jurisprudential authority supports the remedy the defendant urges to cure this alleged handicap.

The defendant correctly notes in his brief that La. C.E. art. 607(B) provides that a witness' credibility cannot be supported until it is attacked. Thus, the defense is otherwise prohibited from bolstering the credibility of its witnesses. The defense theory, that prosecutors discredited Goff by accusing him of failing to timely report his observations to the police, and that his credibility in turn would have been supported with evidence that he refrained from reporting his observations only because he chose to invoke his Fifth Amendment right, would not in fact serve to support Goff's credibility. The issue, at least under the defendant's theory, is not whether Goff had a Fifth Amendment right – unquestionably he did. Rather, the issue is whether the jury in this trial would have found

Goff's credibility bolstered because it understood that Goff chose to invoke his Fifth Amendment right instead of volunteering his observations to the police, observations that allegedly exculpated him and the defendant.  This argument is unlikely.

Additionally, the defense mischaracterizes the issue as whether the defense should have been permitted to disclose Goff's acquittal.  The failure to disclose Goff's acquittal is not an ingredient necessary to the defense's theory of prejudice, because the defense's theory focuses on Goff's right to invoke his Fifth Amendment right.  The defense argues that the reason Goff at first kept his silence is that he chose to invoke his Fifth Amendment right.  Later, at the second trial, he volunteered his testimony.  The defense was not prohibited from revealing at this trial that Goff previously remained silent because he chose to invoke his Fifth Amendment right.  The defense was only prohibited from revealing Goff's alleged reason behind his change of heart (i.e., his acquittal).  The defendant offers no explanation under his theory why the reason for Goff's new willingness to testify was necessary for the jury to hear.  As previously noted, revealing Goff's acquittal would serve only to prejudice the jury into believing that the defendant should likewise be acquitted.  This assignment is without merit.[39]

As the state court observed, state evidence law does not permit a witness' credibility to be bolstered until it is attacked.  As previously noted, to the extent that petitioner is arguing that the state courts misapplied state law, his claim simply is not cognizable.  Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).  Further, to the extent that petitioner is claiming that the exclusion of the evidence rendered his trial fundamentally unfair under federal law, that claim has no merit.  Louisiana's rule that a

---

[39] State v. Laugand, No. 2002-KA-0873, at pp. 7-9; State Rec., Vol. I of IX.  The Louisiana Supreme Court denied the related writ application without assigning reasons.  State v. Laugand, 862 So.2d 980 (La. 2004) (No. 2003-K-1868); State Rec., Vol. I of IX.

witness' credibility may not be bolstered until attacked does not run afoul of federal law.  See Roussell v. Jeane, 842 F.2d 1512, 1522 n.6 (5th Cir. 1988).

In light of the foregoing, the Court finds that petitioner has failed to demonstrate that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects the claim.

<u>Perjury</u>

Petitioner next claims that the prosecution presented perjured testimony.  With respect to this claim, he again points to the inconsistencies between the witnesses' trial testimony and pretrial statements they purportedly made.  Petitioner further contends that the prosecutor, despite being aware that the witnesses were lying, allowed the perjury to go uncorrected.

In support of his contentions, petitioner points first to inmate Gordon Newman's testimony at trial.  According to Newman, Mathieu showed petitioner a sign indicating that he was going to help him.[40]  Newman also testified that he was told by Mathieu that he did not see the shooting.[41]

Second, petitioner points to inmate Eugene Forrest's statement regarding Mathieu's alleged knowledge of the affidavit as discussed previously in this opinion.

---

[40]  Newman testified that Mathieu's sign stated, "Don't worry.  It's all good."  State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 22.

[41]  State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 21.

Third, petitioner points to a conversation between Mathieu and Assistant District Attorney Robert Jordan secretly taped by defense investigator Bob Smith.   According to representations made at trial outside the presence of the jury,[42] Smith had eavesdropped on and recorded several minutes of a private conversation between Mathieu and Jordan in a closed room at the jail.  During that conversation, Mathieu allegedly stated that he did not see the shooting but that he would say whatever the prosecutor wanted.  The trial judge refused to allow the audiotape to be introduced at trial.  The judge noted that he had reviewed the audiotape *in camera* and that he could find "no corroboration for a statement that Mr. Jordan suborned perjury, nor that this witness [Brian Mathieu] gave a statement on the date that this was recorded that was inconsistent with the testimony that he has given in this Court."[43]  However, although the audiotape was disallowed, the judge allowed Smith to testify regarding the alleged conversation.[44]

For a petitioner to establish that his constitutional rights have been violated by the introduction of perjured testimony, he "must show (1) the *actual falsity* of a witness's testimony, (2) that the testimony was material, and (3) that the prosecution *knew* the witness's testimony was false."  Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001) (emphasis added).  In this case, petitioner has presented no evidence that the trial testimony was in fact false, much less that the prosecution knew it was false.  Petitioner's evidence shows nothing more than the fact that Mathieu

---

[42]   The tape, the circumstances under which it was made, and its inadmissibility were discussed at length at trial.  See State Rec., Vol. VI of IX, transcript of November 30, 2000, pp. 78-120.

[43]   State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 111.

[44]   State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 130.

and the other witnesses purportedly previously made statements contradictory to their testimony at trial.   However, that is woefully short of the evidence required to support a claim that the prosecution knowingly presented perjured testimony.  See Kutzner v. Cockrell, 303 F.3d 333, 337 (5th Cir. 2002) ("[I]t is not enough that the [allegedly perjurious] testimony is challenged by another witness or is inconsistent with prior statements." ).  Accordingly, petitioner has not met his burden of proof with respect to this claim and, therefore, the claim necessarily fails.

Petitioner has failed to demonstrate that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects petitioner's perjury claim.

## Mistrial

In his amended petition, petitioner claims that the trial judge abused his discretion in failing to declare a mistrial in light of the existence of Smith's secret audiotape.  Petitioner argues that the trial judge wrongly found the tape to be inadmissible based on an erroneous conclusion that it was illegal for Smith to tape the conversation between Jordan and Mathieu.[45]

As an initial matter, petitioner's claim that the trial judge should have granted a mistrial based on Article 775 of the Louisiana Code of Criminal Procedure is not cognizable in this

---

[45]  Petitioner is correct in noting that it was subsequently determined that Smith's actions were not illegal.  In connection with the taping, both Smith and Arcenius Armond, petitioner's defense counsel, were indicted for violating La.Rev.Stat.Ann. § 15:1303, which pertains to the illegal interception and disclosure of wire, electronic, and oral communications.  However, Judge Charles Elloie granted defendant's motion to quash the indictment.  The Louisiana Fourth Circuit Court of Appeal upheld that ruling, noting that Smith's actions did not violate state law.  State v. Smith, 848 So.2d 650 (La. App. 4th Cir. 2003).

- 24 -

proceeding.  As noted previously, federal *habeas corpus* relief may be granted only to remedy

violations of the Constitution and laws of the United States.  28 U.S.C. § 2254; Engle v. Isaac, 456

U.S. 107, 119 (1983).  Therefore, even if there had been a violation of Article 775, that state law

violation would not warrant federal relief.

Second, in any event, petitioner's claim is not supported by the record.  To the extent

that petitioner is arguing that the audiotape was disallowed at trial due to its being illegally obtained,

that is not accurate.  The trial judge was clear that the audiotape was disallowed because it did not

show what defense counsel purported and, therefore, was not relevant or proper impeachment

evidence.  The judge stated:

> I've listened to the tape, I've listened to the CD, and I've listened to
> it via head phones.  And I quite honestly and frankly, Mr. Armond,
> based on what I hear I do not share your interpretation of what was
> spoken.  And that is that on this CD you allege that Mr. Jordan asked
> this witness, Mr. Mathieu, "Did you see the murder?" and he says,
> "No, I did not."  I quite frankly didn't hear that.[46]

This Court also notes that petitioner was subsequently granted access to the audiotape to have it

enhanced and transcribed to show that it did in fact show what defense counsel purported.[47]  Despite

having access to the tape, petitioner has never shown that the audiotape included any statements by

Mathieu to the effect that he did not see the shooting or that he would say anything the prosecution

---

[46]  State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 114.

[47]  See State Rec., Vol. VI of IX, transcript of January 23, 2002, p. 6; see also State Rec., Vol.
VIII of IX, Supplemental Application for Post-Conviction Relief, p. 41 (indicating that the tape was
made available to defense counsel on January 17, 2002).

wanted.  Accordingly, petitioner has never demonstrated that the trial court erred in disallowing the tape.

Moreover, this Court notes that, while the trial judge did not allow the audiotape to be introduced, he did allow Smith to testify as to what he allegedly overheard:

> Q.     ... [T]he question to you was what did you hear Mr. Mathieu say?
>
> A.     Mr. Mathieu, to the best of my knowledge, inferred something about not having any knowledge of the shooter at the time, or something to that effect.
>
> Q.     Did he make any other statements?
>
> A.     He further stated that he would say anything Mr. Jordan wanted him to say.[48]

In light of the foregoing, petitioner has simply made no showing that his rights were violated in any way regarding the disallowance of the audiotape.  He has never shown that the audiotape of a portion of the conversation was relevant for impeachment purposes.  Further, he was allowed to present the evidence which *was* relevant regarding the conversation, i.e. Smith's testimony as to what he allegedly overheard.  Accordingly, petitioner has not demonstrated that he was entitled to any form of relief at trial, much less the granting of a mistrial.

Petitioner has failed to demonstrate that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects petitioner's claim.

---

[48]  State Rec., Vol. VI of IX, transcript of November 30, 2000, p. 130.

- 26 -

**RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Raymond Laugand be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this sixteenth day of August, 2007.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**